JUDGE LINDBERG

02 C 9086

ISSUED

MAGISTRATE JUDGE
SUMMON GERALDINE SOAT BROWN

FILED

DEC 1 8 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

FILED 2002 OCT 28 PM 4:27
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

1  JoAnne S. Redmann (State Bar No. 147903)
2  Jennifer Whiting (State Bar No. 205135)
   CROSBY, HEAFEY, ROACH & MAY
3  Professional Corporation
   1901 Avenue of the Stars
4  Suite 700
   Los Angeles, CA 90067
5

6  **Mailing Address:**
   1901 Avenue of the Stars
7  Suite 700
   Los Angeles, CA 90067
8

9  Telephone:(310) 734-5200
   Facsimile: (310) 734-5299
10

11 Attorneys for Plaintiff City of Inglewood

12            UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14

15 CITY OF INGLEWOOD, a            CASE NO. CV02-4594 DT (AJWx)
   municipal corporation and a
16 charter city organized under the
   laws of the State of California
17
            Plaintiff,
18
                               **AMENDED
19    Vs.                       COMPLAINT FOR INJUNCTIVE
                               RELIEF AND DAMAGES BASED ON:**
20
21                              1.   Copyright Infringement —Federal
                                    Law
22 CITY OF CHICAGO, a           2.   Breach of Contract
   municipal corporation; and   3.   Declaratory Judgment of No
23 DOES 1 THROUGH 100                Breach of Contract
                               4.   Unfair Business Practices
24          Defendants.
25
26       Plaintiff City of Inglewood ("INGLEWOOD") alleges against
27 the Defendant City of Chicago ("CHICAGO") as follows:
28

ORIGINAL

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

ENTERED ON ICMS
OCT 2 9 200

- 1 -

Amended Complaint

15338347.1

1   This is a complaint for injunctive relief and damages based
2   on breach of contract and willful copyright infringement, as well as
3   related claims.

**JURISDICTION**

4
5   1.   This Court has jurisdiction over this action under 17 U.S.C.
6   Section 1, et seq. (the federal copyright law, "Copyright Act"); 28
7   U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1338(a) (any
8   act of Congress relating to patents, copyrights and trademarks); 28
9   U.S.C. § 1338(b) (action asserting a state claim of unfair competition
10  joined with a substantial and related federal claim under the patent,
11  copyright or trademark laws); 28 U.S.C. § 1367 (supplemental
12  jurisdiction); 28 U.S.C. § 1332 (diversity of citizenship between
13  plaintiff and all defendants and the amount in controversy exceeds
14  $75,000, exclusive of interest and costs); 28 U.S.C. § 2201 and 2202
15  (declaratory judgment); and the doctrines of ancillary and pendent
16  jurisdiction.

**VENUE**

17
18  2.   Venue in this judicial district is proper under the provisions
19  of 28 U.S.C. § 1400(a) because, on information and belief, Defendant
20  CHICAGO is subject to personal jurisdiction of this Court as Defendant
21  CHICAGO is conducting business in this judicial district and has
22  maintained such minimum contacts so as to subject itself to personal
23  jurisdiction by this Court, and a substantial part of the events giving
24  rise to the alleged claims in this action occurred in this judicial district.

**PARTIES**

25
26  3.   Plaintiff INGLEWOOD is a municipality and also a charter city
27  organized and existing under the laws of the State of California.
28  4. Defendant CHICAGO is a municipality organized and existing

15338347.1

Amended Complaint

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

1 under the laws of the State of Illinois.

2 **FACTUAL BACKGROUND**

3 5.    As many municipalities derive substantial income from
4 parking ticket enforcement programs, more than twenty years ago the
5 city leaders of INGLEWOOD determined that it would be desirable to
6 develop an automated system that would be capable of providing and
7 maintaining an efficient and successful parking management and
8 enforcement program.

9 6.    Because the age of a ticket is directly related to its
10 collectability, data that is old or inaccurate, and collection systems that
11 are slow and cumbersome substantially reduce the ability of a
12 municipality to collect its revenues derived from parking ticket
13 enforcement.

14 7.    To increase its revenues, INGLEWOOD undertook to develop
15 a successful parking management and enforcement system using state-
16 of-the-art computer technology.

17 8.    Over the years, INGLEWOOD developed its automated
18 system, "The Parking Ticket System" ("PTS"), which successfully
19 automates many of the functions critical to the success of any parking
20 enforcement policy, from ticket issuance through a ticket's final
21 disposition.

22 9.    PTS provides automation of many functions, including DMV
23 inquiries, creation and mailing of notices, tracking of payment
24 information, ticket tracking, collection data, and creation of
25 management reports.

26 10.    INGLEWOOD has invested substantial time, effort and
27 resources in creating and developing PTS, including the PTS computer
28 software. PTS computer software embodies a large amount of

- 3-

15338347.1

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

1    computer programs that are wholly original to INGLEWOOD and are
2    copyrightable subject matter pursuant to 17 U.S.C. § 102.
3    INGLEWOOD owns the valuable copyright to the protectable features of
4    PTS.

5         11.    INGLEWOOD has complied in all respects with the Copyright
6    Act of the United States and all other laws governing copyright, has
7    secured the exclusive rights and privileges in and to the copyright for
8    PTS computer software, and has received from the Register of
9    Copyrights copyright registration for the PTS computer software,
10    Copyright Registration No. TXu 1-028-829. Attached hereto as Exhibit
11    A is true and correct copy of this copyright registration. INGLEWOOD's
12    copyrighted work is referred to as the "SUBJECT WORK."

13         12.    INGLEWOOD is currently, and at all relevant times has been,
14    the sole proprietor of all right, title, and interest in and to the copyright
15    in the SUBJECT WORK. INGLEWOOD has produced and distributed the
16    SUBJECT WORK in strict conformity with the provisions of the
17    Copyright Act and all other laws governing copyright.

18         13.    In addition to creating, updating, and enhancing its
19    automated PTS computer software, INGLEWOOD also developed an
20    administrative infrastructure to support and run its PTS system.

21         14.    With its powerful PTS computer software, and its PTS
22    system administration in place, INGLEWOOD identified that it could
23    provide PTS to other municipalities as client/partners. INGLEWOOD
24    offered PTS to other cities with the option of providing system
25    administration. PTS client/partners of INGLEWOOD connect to
26    INGLEWOOD's PTS computer system or PTS is licensed to its
27    client/partners to be hosted on the client/partner's own computer
28    system.

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

- 4-

15338347.1

1   15.   PTS became an increasing source of revenue for

2   INGLEWOOD as INGLEWOOD's customer base for PTS increased.

3   Today, 75 California cities plus CHICAGO and Dallas, Texas, use PTS.

**GENERAL ALLEGATIONS**

5   16.   On July 21, 1998, INGLEWOOD entered into a contract with

6   CHICAGO for the license of the PTS computer software (the SUBJECT

7   WORK).  This contract is entitled "Parking Ticket Software License

8   Agreement between The City of Inglewood, California and The City of

9   Chicago, Illinois" (hereafter the "AGREEMENT").  Attached hereto as

10  Exhibit B is a true and correct copy of the AGREEMENT.

11  17.   The AGREEMENT provides, in relevant part, that during the

12  term of the AGREEMENT, CHICAGO may copy, enhance, modify, and

13  use the SUBJECT WORK and create derivative works for the "conduct

14  of its own internal affairs" (Ex. B, AGREEMENT, paragraph 2.1,

15  page 3).

16  18.   It was contemplated by the parties that CHICAGO would

17  enhance the licensed SUBJECT WORK to create a derivative work (the

18  derivative work referred to herein as "the Combined System") for its

19  own internal use, and that CHICAGO would be assisted with such

20  enhancement by International Business Machines (herein "IBM").  The

21  AGREEMENT provides that INGLEWOOD continues to own all rights in

22  the SUBJECT WORK, including those rights in the Combined System

23  that result from the inclusion of the SUBJECT WORK in the Combined

24  System.

25  19.   To facilitate the creation of the Combined System, and

26  CHICAGO's implementation of the PTS software, INGLEWOOD's

27  information technology staff (herein "IT Staff")  made numerous trips to

28  CHICAGO for technical support.  Upon information and belief, the

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

- 5-

15338347.1

1  Combined System is hosted and administrated by IBM at one of IBM's
2  facilities (the "IBM site") in downtown Chicago, Illinois. The IT Staff
3  worked at the IBM site to help IBM and CHICAGO implement the
4  Combined System. The Combined System was successfully launched
5  by CHICAGO in 1998, and remains operational today.

6      20.  At all times relevant, INGLEWOOD was (and is) in complete
7  compliance with all of the terms and conditions of the AGREEMENT.

8      21.  Under the terms of the AGREEMENT, CHICAGO was and is
9  required to make yearly royalty payments. At first, CHICAGO made it
10  royalty payments. Payments were timely made through 2000.
11  However, the July, 2001 payment was not timely paid by CHICAGO.

12      22.  As of October 18, 2001, CHICAGO had not paid its 2001
13  royalty payment of $400,000.00 which was due on July 24, 2001.
14  On October 18, 2001, INGLEWOOD wrote to CHICAGO and requested
15  that CHICAGO pay its 2001 royalty payment. (See letter to CHICAGO,
16  Exhibit C.) When CHICAGO did not respond, INGLEWOOD sent a
17  follow-up letter on December 4, 2001 from its counsel. (See letter to
18  CHICAGO, Exhibit D.)

19      23.  In response to INGLEWOOD's correspondence, CHICAGO
20  sent two (2) letters. The first letter dated December 4, 2001 (the "Y2K
21  Letter" attached hereto as Exhibit E) from counsel for CHICAGO
22  advised INGLEWOOD that the PTS computer software (the SUBJECT
23  WORK) provided to CHICAGO by INGLEWOOD had a Y2K defect that
24  was a "material defect" and thus INGLEWOOD had breached its
25  warranty in the AGREEMENT, causing CHICAGO to incur damages in
26  the amount of $900,000.00. This first notice of any alleged Y2K
27  defect was provided to INGLEWOOD one (1) year, eleven (11) months
28  and four (4) days after the Y2K clock rollover on January 1, 2000.

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

15338347.1

24.  The second letter dated December 11, 2001 responding to INGLEWOOD's October 18th letter (attached hereto as Exhibit F) from Matthew Darst, Deputy Director, included a draft of $400,000.00 as payment of CHICAGO's 2001 royalty.

25.  Because the content of the second letter was inconsistent with the Y2K Letter (and the two were so close in time), INGLEWOOD believed the Y2K Letter to be in error — simply a failure of communication in CHICAGO.  INGLEWOOD responded to the second letter acknowledging payment of the 2001 royalty.  (See Exhibit G, letter of December 19, 2001.)

26.  On March 11, 2002, INGLEWOOD received a letter dated March 1, 2002 from CHICAGO referring to its Y2K Letter and purporting to seek to initiate the dispute resolution provision of the AGREEMENT.  (See letter, Exhibit H.)

27.  On March 26, 2002, INGLEWOOD responded to the letter of March 11, 2002 and advised CHICAGO that it believed the Y2K claim was frivolous.  However, INGLEWOOD provided CHICAGO with the name of its representatives for the purpose of discussing outstanding disputes.  INGLEWOOD again requested a copy of the IBM Agreement. (See Exhibit I.)

28.  On May 21, 2002, CHICAGO advised INGLEWOOD that it had provided notice of its claim of Y2K defects in mid-2000.  (See attached letter dated May 21, 2002, Exhibit J.)  These claims of notice were false as INGLEWOOD had never received any notice from CHICAGO of any Y2K defects in the SUBJECT WORK (that is, the PTS computer software); there were no Y2K defects in the PTS computer software.

29.  In mid-2002, CHICAGO provided a summary of items alleged

-7-

15338347.1

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

1 to not be Y2K compliant in the PTS computer software. INGLEWOOD
2 reviewed this summary and rebutted each contention, including
3 CHICAGO's inclusion of items that were not part of CHICAGO's PTS
4 computer software. INGLEWOOD provided its rebuttal information to
5 CHICAGO in the form of conversations and documentation.
6 INGLEWOOD explained to CHICAGO that its PTS computer software
7 could not have had any Y2K compliance defects because the same PTS
8 computer software was used, and had been used by INGLEWOOD and
9 all of its other licensees without any Y2K problems or defects.

10     30. On July 24, 2002, CHICAGO failed to pay its 2002 royalty
11 payment of $400,000.00 to INGLEWOOD as required by the
12 AGREEMENT.

13     31. On or about August 21, 2002, CHICAGO received written
14 notice from INGLEWOOD, pursuant to Section 2.1(ii) of the Agreement
15 that INGLEWOOD intended to revoke CHICAGO's license to the
16 SUBJECT WORK if the overdue July 24, 2002 royalty payment of
17 $400,00.00 was not made within sixty (60) days of INGLEWOOD's
18 written notice. (See letter dated August 21, 2002, Exhibit K.)

19     32. As of the present date, CHICAGO still has not paid its
20 July 24, 2002 royalty payment of $400,000.00 and continues to
21 withhold payment. Instead, on October 8, 2002, CHICAGO notified
22 INGLEWOOD that it was revising its demand for Y2K damages to
23 between $340,625 and $378,125 alleging that CHICAGO had spent
24 2,725 – 3,025 hours on Y2K issues related to the PTS computer
25 software.

26     33. CHICAGO then sent another letter to INGLEWOOD, and
27 included with its letter a draft in the amount of $100,000.00 stating
28 that the $100,000.00 was all it owed to INGLEWOOD, as CHICAGO

- 8-     15338347.1

1    was using the alleged Y2K damages, and its intended termination of the
2    license (anticipated at the end of 2002) to the SUBJECT WORK as
3    justification for a claim of set off of $300,000.00. Thus, the
4    $100,000.00 draft was intended by CHICAGO to be instead of the
5    $400,000.00 it owed to INGLEWOOD. (See letter dated October 22,
6    2002, attached hereto as Exhibit L.)

7        34.   INGLEWOOD has refused to accept CHICAGO's partial
8    payment as CHICAGO's refusal to pay the entire amount due is in bad
9    faith and without any justification. The AGREEMENT requires a royalty
10   payment of $400,000.00 to be paid by July 24, 2002. There is no
11   justification for INGLEWOOD's bad faith refusal to pay its 2002 royalty
12   payment.

13       35.   INGLEWOOD's PTS computer software was and had always
14   been Y2K compliant. CHICAGO never notified INGLEWOOD of any
15   Y2K defects in the PTS computer software as there were and are none.
16   Whether or not CHICAGO intends to terminate the license for the
17   SUBJECT WORK does not relieve CHICAGO from making its July 24,
18   2002 royalty payment of $400,000.00.

19       36.   On October 28, 2002, INGLEWOOD notified CHICAGO that
20   CHICAGO's license to its SUBJECT WORK (the PTS computer
21   software) was revoked. CHICAGO was advised to immediately cease
22   all use of the SUBJECT WORK, including use of the SUBJECT WORK in
23   the Combined System that is a derivative work of the SUBJECT WORK.
24   (See letter to CHICAGO dated October 27, 2002, Exhibit M.)

25       37.   Although all of CHICAGO's rights to the PTS computer
26   software and to the SUBJECT WORKS were and are revoked,
27   CHICAGO willfully continues to use the SUBJECT WORK without
28   INGLEWOOD's permission or consent. CHICAGO is infringing the rights

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

1  of INGLEWOOD in the SUBJECT WORK and continues this activity

2  results in harm and injury to INGLEWOOD.  Among other harms, it

3  deprives INGLEWOOD of its absolute right to determine the manner in

4  which its PTS computer software is marketed and used.

5      38.   An injunction is necessary to enjoin CHICAGO from using

6  the Combined System.

7      39.   Defendant's conduct is continuing, and will continue, unless

8  enjoined by the Court.

9                    **FIRST CLAIM FOR RELIEF**

10              (Copyright Infringement—Federal Law)

11     40.   INGLEWOOD repeats and realleges each and every allegation

12  set forth in the foregoing paragraphs as though fully set forth herein.

13     41.   Since at least as early as the date of authorship for

14  INGLEWOOD's SUBJECT WORK, INGLEWOOD has been, and still is,

15  the sole proprietor of all rights, title and interest in and to the copyright

16  in the SUBJECT WORK.

17     42.   CHICAGO has willfully infringed, and continues to willfully

18  infringe, INGLEWOOD's copyrights in and relating to the SUBJECT

19  WORK by using the Combined System after revocation and termination

20  of its license to the SUBJECT WORK.

21     43.   INGLEWOOD is informed and believes and thereon alleges

22  that the actions of Defendant CHICAGO have been knowing, deliberate,

23  willful and in utter disregard of INGLEWOOD's rights.

24     44.   As a direct and proximate result of Defendant's conduct set

25  forth above, INGLEWOOD has been injured and damaged in an amount

26  to be proven.

27     45.   The above acts by Defendant constitute copyright

28  infringement of INGLEWOOD's copyright in the SUBJECT WORK.  By

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

- 10-                                    15338347.1

1   reason of the foregoing, Defendant has violated, and will continue to

2   violate, the provisions of 17 U.S.C. Section 101 et seq., unless

3   enjoined by the Court.

4          WHEREFORE, INGLEWOOD prays for relief as set forth

5   below.

6                        **SECOND CLAIM FOR RELIEF**

7                          (Breach of Contract)

8          46.   INGLEWOOD repeats and realleges each and every allegation

9   set forth in the foregoing paragraphs as though fully set forth herein.

10         47.   As more fully set described herein, a contract – the

11  AGREEMENT – exists between INGLEWOOD and CHICAGO.

12         48.   INGLEWOOD has fulfilled all of its obligations under the

13  AGREEMENT by complying with all of the AGREEMENT'S terms and

14  conditions, and has performed as required pursuant to the terms of the

15  AGREEMENT.

16         49.   CHICAGO has also breached the AGREEMENT by not

17  providing prompt notice of any alleged defects, error or malfunctions in

18  the PTS computer software and providing INGLEWOOD with the

19  opportunity to provide warranty services as required under the

20  AGREEMENT (paragraph 5.1(b)(iv), pg. 9).  Instead, CHICAGO provided

21  its notice of an alleged defect almost two (2) years later with no

22  opportunity to evaluate the claim and/or to cure, in December, 2001,

23  first claiming damages of $900,000.00, now claiming damages of

24  approximately $400,000.00.

25         50.   CHICAGO has also breached the AGREEMENT by not paying

26  the $400,000.00 royalty payment that was due and owing on July 24,

27  2002.  This royalty payment remains due and owing to INGLEWOOD.

28         51.   INGLEWOOD is entitled, pursuant to paragraph 6.12,

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

1    page 14, of the AGREEMENT to an award of attorney's fees and court

2    costs associated with the enforcement of the AGREEMENT.

3         WHEREFORE, INGLEWOOD prays for relief as set forth

4    below.

5                  **THIRD CLAIM FOR RELIEF**

6           (Declaratory Judgment of No Breach of Contract)

7         52.    INGLEWOOD repeats and realleges each and every allegation

8    set forth in the foregoing paragraphs as though fully set forth herein.

9         53.    By way of unequivocal written notification and demands to

10    initiate dispute resolution, CHICAGO now falsely claims that

11    INGLEWOOD has breached the warranty provision of the AGREEMENT

12    and claims that it was damaged in the amount of $900,000.00 but has

13    substantially reduced this claim to approximately $400,000.

14         54.    INGLEWOOD has not breached, has never breached, and is

15    in full compliance with all of the terms of the AGREEMENT.

16         55.    INGLEWOOD is entitled to a declaration that it has not

17    breached the warranty provisions of the AGREEMENT, in particular,

18    that the PTS computer software provided to CHICAGO under the

19    license was and is Y2K compliant.

20                **FOURTH CLAIM FOR RELIEF**

21              (Unfair Business Practices)

22         56.    INGLEWOOD repeats and realleges each and every allegation

23    set forth in the foregoing paragraphs as though fully set forth herein.

24         57.    CHICAGO's refusal to pay the 2002 royalty payment is in

25    bad faith and without any justification.

26         58.    INGLEWOOD's PTS computer software was and had always

27    been Y2K compliant. CHICAGO never notified INGLEWOOD of any

28    Y2K defects in the PTS computer software as there were and are none.

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

15338347.1

1   CHICAGO's bad faith desire to avoid payment of the amount rightfully

2   owed to INGLEWOOD is the motivation for its meritless claims of Y2K

3   defects, made almost two (2) years after the fact.

4       59.   CHICAGO alleges that CHICAGO intends to convert to a

5   new parking ticket system in the end of 2002.  CHICAGO is making its

6   baseless claim of Y2K defects, and is withholding past due payment to

7   INGLEWOOD, because CHICAGO believes that it will not need the

8   INGLEWOOD PTS computer software after the end of 2002, and not

9   for any legitimate business purpose.

10      60.   Defendant's wrongful acts have proximately caused and will

11  continue to cause INGLEWOOD substantial and irreparable injury,

12  including loss of revenue, and diminution in the value of its intellectual

13  property.

14      61.   Defendant's acts and practices constitute unlawful and

15  unfair business acts and practices within the meaning of California

16  Business and Professions Code Section 17200, et seq.  Defendant's

17  unlawful and unfair business acts and practices are a direct and

18  proximate cause of injury to INGLEWOOD.

19      62.   By reason of the foregoing, Defendant has violated Sections

20  17200, et seq., of the California Business and Professions Code.

21                    **PRAYER FOR RELIEF**

22      WHEREFORE, Plaintiff prays the Court for the following

23  relief:

24      63.   That judgment be entered in favor of INGLEWOOD and

25  against Defendant on all counts;

26      64.   That judgment be entered in favor of INGLEWOOD and

27  against Defendant for all damages sustained by INGLEWOOD due to

28

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

- 13-                                                    15338347.1

1    Defendant's copyright infringement under the Copyright Act;

2    65. That judgment be entered in favor of INGLEWOOD and

3    against Defendant for willful copyright infringement, including an

4    increase to treble damages for CHICAGO's willful infringement, and for

5    costs and attorney's fees as provided for by the Copyright Act;

6    66. For an order providing that INGLEWOOD has not breached

7    any warranty of the AGREEMENT and, in particular, any warranty

8    related to Y2K compliance;

9    67. That the Court permanently enjoin Defendant, its officers,

10    directors, principals, agents, servants, employees, successors and

11    assigns, and all other persons in active concert or privity or in

12    participation with Defendant, jointly and severally, from infringing or

13    authorizing infringement of any of INGLEWOOD's copyrights, including

14    INGLEWOOD's copyright in the SUBJECT WORK.

15    68. That the Court order that CHICAGO pay all of

16    INGLEWOOD's attorneys' fees and court costs associated with this

17    action; and

18    69. That INGLEWOOD be awarded such other and further relief

19    as the Court may deem just and proper.

21    DATED: October 28, 2002.

23    CROSBY, HEAFEY, ROACH & MAY
Professional Corporation

26    By _____
JoAnne S. Redmann
Attorneys for Plaintiff
City of Inglewood

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

- 14-

15338347.1

## DEMAND FOR JURY TRIAL

Plaintiff City of Inglewood hereby demands a jury trial as to all triable issues in this action.

DATED: *October 28, 2002.*

CROSBY, HEAFEY, ROACH & MAY
Professional Corporation

By _JoAnne S. Redmann_
JoAnne S. Redmann
Attorneys for Plaintiff
City of Inglewood

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

- 15-

15338347.1

Amended Complaint

CERTIFICATE OF REGISTRATION

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

OFFICIAL SEAL

**FORM TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REGI...



**TXu 1-028-829**

EFFECTIVE DATE OF REGISTRATION

MAY 13 2002
Month      Day      Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

TITLE OF THIS WORK ▼
The Parking Ticket System Software

PREVIOUS OR ALTERNATIVE TITLES ▼

PUBLICATION AS A CONTRIBUTION If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    Title of Collective Work ▼

If published in a periodical or serial give:    Volume ▼        Number ▼        Issue Date ▼        On Pages ▼

**2**

**a**
NAME OF AUTHOR ▼
The City of Inglewood, California

DATES OF BIRTH AND DEATH
Year Born ▼ N/A        Year Died ▼ N/A

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶ USA

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☑ No
Pseudonymous? ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**b**
NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**
NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**a**
YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
1988  1997 ◀ Year

**b**
DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ _____ Day ▶ _____ Year ▶ _____ ◀ Nation

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

The City of Inglewood, California
One West Manchester Blvd., #860
Inglewood, CA  90312-6500

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
MAY 13 2002
ONE DEPOSIT RECEIVED
MAY 13 2002
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

---

MORE ON BACK ▶  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

EXHIBIT A
PAGE 0016

DO NOT WRITE HERE
Page 1 of 2 pages

*Amended by C.O. per email 5-22-02 from
Jennifer Whiting. See correspondence file.

EXAMINED

CHECKED BY

☑ CORRESPONDENCE
Yes

FORM TX

FOR
COPYRIGHT
OFFICE
USE
ONLY

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes  ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▶                **Year of Registration** ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**6**

See instructions
before completing
this space.

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

---

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼
Jennifer V. Whiting, Esq.
Crosby Heafey Roach & May
1901 Avenue of the Stars, Suite 700
Los Angeles, California 90067

**b**

Area code and daytime telephone number ▶ (310) 734-5272                Fax number ▶ (310) 734-5299
Email ▶ jwhiting@chrm.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
                                                    Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of **The City of Inglewood, California**
of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.
                        Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Jeff S. Muir                                            Date ▶ 5/9/2002

Handwritten signature (X) ▼

X _____ Jeff S. Muir

---

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼
Jennifer V. Whiting
Crosby Heafey Roach & May
Number/Street/Apt ▼
1901 Avenue of the Stars, Suite 700
City/State/ZIP ▼
Los Angeles, California 90067

YOU MUST
• Complete all necessary spaces
• Sign your application in space 8
SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order
   payable to Register of Copyrights
3. Deposit material
MAIL TO
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

As of
July 1,
1999,
the
filing
fee for
Form TX
is $30.

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact
with the application, shall be fined not more than $2,500.
June 1999—200,000
WEB REV: June 1999        ♺ PRINTED ON RECYCLED PAPER

EXHIBIT A
PAGE 0017

...d for by section 409, or in any written statement filed in connection

☆U.S. GOVERNMENT PRINTING OFFICE: 1999-454-879/49

# CITY'S ORIGINAL

98-286

# PARKING TICKET SOFTWARE

# LICENSE AGREEMENT

# BETWEEN

## THE CITY OF INGLEWOOD, CALIFORNIA

### and

## THE CITY OF CHICAGO, ILLINOIS

EXHIBIT *B*
PAGE 0018

98-286

# TABLE OF CONTENTS

Page

1. DEFINITIONS ........................................................................2
2. GRANT OF LICENSE ..............................................................3
   2.1. License to City of Chicago ...............................................3
   2.2. Internal Usage ...............................................................3
3. PROPRIETARY PROTECTION, AND RESTRICTIONS ...............4
   3.1. Ownership of Licensed Software ........................................4
   3.2. Copies and Modifications of Licensed Software .....................4
   3.3. Scope of City of Chicago's Rights.......................................4
   3.4. Delivery.......................................................................5
   3.5. Proprietary Markings ......................................................5
   3.6. Duplication of User Documentation ....................................5
   3.7. Non-Disclosure ..............................................................6
   3.8. Royalty Payments for Usage by Chicago ..............................7
4. CONDITIONAL PROVISIONS ...................................................7
   4.1. Conditions Precedent ......................................................7
   4.2. Additional Royalties .......................................................7
   4.3. Marketing to Other Cities ................................................7
   4.4. Division of Net Revenues ................................................7
   4.5. Costs of Defense ...........................................................8
5. WARRANTIES, INDEMNITIES AND LIABILITIES ...................8
   5.1. Warranty .....................................................................8
   5.2. Proprietary Rights Indemnification.....................................10
   5.3. Limitation of Liability ....................................................11
6. MISCELLANEOUS ................................................................12
   6.1. Entire Agreement ..........................................................12
   6.2. Dispute Resolution ........................................................12
   6.3. Notice.........................................................................12
   6.4. Headings .....................................................................13
   6.5. Relationship of Parties ....................................................13
   6.6. Force Majeure ..............................................................13
   6.7. Severability ..................................................................14
   6.8. No Third Party Beneficiary ..............................................14
   6.9. Waiver........................................................................14
   6.10. Written Modifications Required .......................................14
   6.11. Right to Transfer Rights.................................................14
   6.12. Attorney's Fees...........................................................14
   6.13. Freedom of Action .......................................................15

EXHIBIT _B_
PAGE 0019

98—286

# PTS SOFTWARE LICENSE AGREEMENT

## By and Between

## THE CITY OF INGLEWOOD, CALIFORNIA

## and

## THE CITY OF CHICAGO, ILLINOIS

This License Agreement ("Agreement"), dated the 21st day of July, 1998, is by and between The City of Chicago, a Municipal corporation and home rule government organized under the laws of the State of Illinois ("Chicago"), and The City of Inglewood, California, a municipal corporation organized under the laws of the State of California ("Inglewood").

## WITNESSETH

WHEREAS, City of Inglewood has developed software to support the automated parking enforcement management requirements of municipalities; and

WHEREAS, City of Chicago desires to obtain from City of Inglewood permission to use, document, and modify City of Inglewood's software and related documentation, which City of Chicago intends to do with the assistance of International Business Machines Corporation ("IBM") pursuant to an agreement to be entered into between City of Chicago and IBM; and

WHEREAS, a copy of the City of Chicago's agreement with IBM will be delivered to City of Inglewood; and

WHEREAS, IBM is to execute a separate License Agreement with Inglewood by which modification or use of Inglewood software for this purpose is expressly authorized, and

WHEREAS, both Agreements will be attached hereto and it is the parties' intention that both agreements are consistent herewith.

WHEREAS, City of Chicago desires to make substantial improvements to City of Inglewood's application to modify that application for use in Chicago; and

WHEREAS, City of Inglewood desires to grant to City of Chicago the right to make these changes to City of Inglewood's software.

- 1 -

EXHIBIT $\mathcal{B}$
PAGE 0020

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1. **DEFINITIONS**

As used in this Agreement, the following terms shall have the meanings set forth below

(a) *"California Market"* shall mean the entire State of California except for the City and County of San Francisco and any cities within the County of Los Angeles with which the City of Inglewood has executed contracts for parking ticket services as of the date of execution of this agreement.

(b) *"Chicago System"* shall mean the modifications and enhancements made to the Licensed Software for purposes of its use in Chicago and any related User Documentation generated by Chicago or its designee for such purpose.

(c) *"Citation"* shall mean any summons, ticket, or other similar notice of violation that is issued for the violation or breach of a municipal ordinance.

(d) *"Combined System"* shall mean the Licensed Software as modified and enhanced by the Chicago System.

(e) *"Joint Market"* shall mean the entire world except for the California Market and the City of Chicago.

(f) *"Licensed Software"* shall mean City of Inglewood's software system for the automated management of parking-citation enforcement, including the security system and email system that interface with that system. Licensed Software shall also include all "Upgraded Software" (as defined below).

(g) *"Net Revenues"* shall be computed on a quarterly basis and shall consist of total fees and other charges paid by third parties during such quarter attributable to licensing the Combined System to (or operating it for the use or benefit of) Governmental Units in the Joint Market, less direct expenses incurred by the parties in marketing said system to such Governmental Units, regardless of which party actually collected the revenue or incurred the expense. Expenses shall be subject to mutual approval by the project managers of City of Chicago and City of Inglewood; provided, however, that all reasonable expenses will be approved.

(h) *"Upgraded Software"* shall mean modified versions of the Licensed Software that incorporate enhancements, upgrades, or changes that City of Inglewood makes to the Licensed Software.

- 2 -

(i)     *"User Documentation"* shall mean all technical manuals and specifications, source code listings, user manuals, and narrative descriptions and training materials and manuals describing or relating to the operation of the Licensed Software, the Upgraded Software, the Chicago System, or the Combined System.

(j)     *"Reimbursable Expenses"* shall mean expenses that the parties hereto hereinafter agree to be reimbursable within the meaning this Agreement.

## 2.     GRANT OF LICENSE

### 2.1.     License to City of Chicago

City of Inglewood grants to City of Chicago the nonexclusive, perpetual, and irrevocable (except as set forth below) right and license to use, copy, modify, enhance, and improve the Licensed Software (including both the source code and the object code embodiments thereof) and the related User Documentation, for the purpose of developing, creating, and using the Chicago System and the Combined System (and the user documentation therefor), and using them for any of the purposes indicated in Sections 2 or 4 hereof. The Chicago System, as distinct from the Licensed Software as a component thereof and the Combined System, shall be owned solely by City of Chicago. Neither party shall be allowed to license, transfer, or assign any right, title, or interest in or to the Combined System without the prior written consent of the other party. Both City of Chicago and City of Inglewood agree to keep their respective components of the Combined System free and clear of liens, claims, and encumbrances. City of Inglewood shall have the right to revoke its license to the Licensed Software and the Upgraded Software only if (i) City of Chicago willfully and wrongfully fails to make its payments as required under Section 3.8 of this Agreement, (ii) City of Inglewood has given written notice of such failure to City of Chicago, and (iii) City of Chicago has failed to cure within sixty (60) days after receipt of such notice.

### 2.2.     Internal Usage

Subject to the terms of this Agreement, each party (including the parties' respective employees, agents, and third-party service-providers) shall have the unlimited right to use the Chicago System and the Combined System and any upgrade or enhancement of either made by or for either party hereto (a "Subsequent Upgrade") for any purpose related to the conduct of its own internal affairs, with no limitations upon the number of users of such system for such purposes, and shall have no duty to account to the other for any revenues or results generated by such usage provided that such right shall be granted as to any Subsequent Upgrade only to the extent that a party hereto has the right to grant such rights. Upon request by City of Inglewood, after City of Chicago has completed all development and testing procedures to its satisfaction, City of Chicago shall provide City of Inglewood with one (1) copy of the Chicago System's source code, object code, and User Documentation.

- 3 -

3. **PROPRIETARY PROTECTION, AND RESTRICTIONS**

3.1. **Ownership of Licensed Software**

City of Inglewood shall have sole and exclusive ownership of all right, title, and interest in and to the Licensed Software and all Upgraded Software (including ownership of all trade secrets and copyrights pertaining thereto). City of Chicago shall have no rights or interests therein except as set forth in this Agreement. All revenues resultant from usage of the Licensed Software or the Upgraded Software by cities within the California Market will remain the sole property of City of Inglewood. City of Inglewood agrees to keep the Licensed Software and the Upgraded Software free and clear of all claims, liens, and encumbrances, and City of Chicago agrees to take no action that would result in the creation of any claim, lien, or encumbrance thereon.

3.2. **Copies and Modifications of Licensed Software**

City of Chicago may not use, copy, modify or distribute the Licensed Software (electronically or otherwise), or any copy, adaptation, transcription, or merged portion thereof, except as provided in this Agreement or as expressly authorized by City of Inglewood.

3.3. **Scope of City of Chicago's Rights**

(a)    City of Chicago may install the Licensed Software in its own owned or leased facilities only (or those of any third party engaged to operate, or assist in the operation of, said software). References to City of Chicago's use or benefit include any agencies, divisions or other units of the City of Chicago, provided that they comply with the restrictions herein. Except as agreed otherwise in writing, City of Inglewood assumes no responsibility under this Agreement for obtaining or providing any equipment.

(b)    City of Chicago may use and execute the Licensed Software on any equipment, for purposes of serving the internal needs of City of Chicago's business and affairs. In support of its authorized use of the Licensed Software, City of Chicago may store the Licensed Software's machine-readable instructions or data in, transmit it through, and display it on, equipment associated with the specified equipment. City of Chicago may make a reasonable number of copies of the Licensed Software (in source code and object code form) as it deems appropriate for its development efforts and may make one copy of the Licensed Software (in source code and object code form) for nonproductive backup purposes only, provided in both cases that City of Inglewood's proprietary legends are included.

(c)    City of Chicago may use, execute, store, and display the Licensed Software, in object code form, and related User Documentation, on behalf of City of Chicago and users of City of Chicago's properties and facilities, at any of City of Chicago's locations and on any item(s) of equipment.

- 4 -

(d)   Access to and use of the Licensed Software by providers of services to City of Chicago shall be considered authorized use under this Section 3.3 so long as such use is in conjunction with City of Chicago's permitted uses, as long as any such providers are bound by the obligations of confidentiality pursuant to this Agreement.

(e)   Except as agreed otherwise in writing, City of Inglewood assumes no responsibility under this Agreement for converting City of Chicago's data files for use with the Licensed Software.

(f)   City of Inglewood understands that all of City of Chicago's data will remain the exclusive property of City of Chicago and City of Inglewood will hold all such data confidential, will disclose it to no other person or entity, and will cooperate in the conversion of said data for use with the Licensed Software.

### 3.4.   Delivery

Concurrent with the execution of this Agreement, City of Inglewood will deliver to City of Chicago one (1) copy of the current source code, object code, and User Documentation of the Licensed Software.   City of Inglewood shall deliver to City of Chicago one (1) copy of the source code, object code, and User Documentation of all Upgraded Software as soon as it is ready for implementation in the sole discretion of the City of Inglewood (but no later than ten days after the date first implemented by City of Inglewood or any other licensee).

### 3.5.   Proprietary Markings

City of Chicago shall preserve and not remove or destroy any proprietary markings or proprietary legends placed upon or contained within the Licensed Software. All information provided by City of Inglewood regarding the Licensed Software, regardless of markings, shall be held to be confidential by City of Chicago and shall not be made available to outside agencies (other than third party service providers) unless said material is clearly marked "for Public Distribution" or as otherwise required by law. It is agreed that the proprietary markings for the Chicago System will not contain the name "City of Chicago" unless "City of Inglewood" is also mentioned in the same sized type and in the same general area of such markings.

### 3.6.   Duplication of User Documentation

City of Chicago may duplicate the User Documentation at no additional charge for City of Chicago's use or for use by a provider of services to City of Chicago in connection with the provision of such services, so long as all required proprietary markings are retained on all duplicated copies.

EXHIBIT *B*
PAGE 0024

### 3.7.   Non-Disclosure

(a)     During the term of this Agreement and for a period of three years thereafter, City of Chicago will treat all of the City of Inglewood's proprietary information that has been marked as "Proprietary" and all of the Licensed Software and the User Documentation, object code, source code, and other documentation associated therewith (collectively, Inglewood's "Proprietary Information"), with the same degree of care and confidentiality as that which City of Chicago provides for similar information belonging to City of Chicago that the City of Chicago does not wish disclosed to the public.  The City of Chicago shall make no disclosure of the content of Inglewood's Proprietary Information, nor deliver any copy thereof, to any third-party that has not entered into a written agreement with City of Inglewood in which such provider agrees, for the benefit of both City of Chicago and City of Inglewood, to use the Licensed Software solely for purposes of development, operation, or support and maintenance of the Chicago System and not to disclose or distribute copies of the Licensed Software to any person or entity other than its own employees, subcontractors or vendors with a need to know and operating under the same restrictions.

(b)     During the term of this Agreement and for a period of three years thereafter, City of Inglewood will treat all of the City of Chicago's proprietary information that has been marked as "Proprietary," and the Chicago System and the Combined System and the User Documentation, object code, source code, and other documentation associated therewith (collectively, City of Chicago's "Proprietary Information"), with the same degree of care and confidentiality as that which City of Inglewood provides for similar information belonging to City of Inglewood that City of Inglewood does not wish disclosed to the public.  City of Inglewood shall make no disclosure of the City of Chicago Proprietary Information, nor deliver any copy thereof, to any third-party that has not entered into a written agreement with City of Inglewood in which such provider agrees, for the benefit of both City of Inglewood and City of Chicago, not to disclose or distribute copies of the City of Chicago Proprietary Information to any person or entity other than its own employees, subcontractors or vendors with a need to know and operating under the same restrictions.

(c)     The foregoing provisions of this Section shall not apply to information that is (i) publicly known or becomes publicly known through no unauthorized act of the recipient thereof as evidenced by written records, (ii) rightfully received from a third party without an obligation of confidentiality as evidenced by written records, (iii) already known by the recipient thereof without an obligation of confidentiality as evidenced by written records, (iv) approved by the owner for disclosure as evidenced by written records, or (v) required to be disclosed pursuant to a requirement of a court of law.

- 6 -

### 3.8. Royalty Payments for Usage by Chicago

In consideration of the licenses granted to City of Chicago under this Agreement, City of Chicago shall make five (5) payments of $400,000.00 each to City of Inglewood, with the first said payment to be made within thirty (30) days after the execution of this agreement (hereinafter the "Effective Date") and the remaining payments on the first four (4) anniversaries of the Effective Date.

## 4. CONDITIONAL PROVISIONS

### 4.1. Conditions Precedent

The provisions of Sections 4.2, 4.3, 4.4, and 4.5 of this Article 4 shall not become effective until and unless approved by the City Council of the City of Chicago. Upon approval by Chicago's City Council, said provisions shall become unconditional and fully effective, without further action by either party. Failure to obtain such approval shall have no effect on the remaining provisions of this Agreement.

### 4.2. Additional Royalties

In addition to the royalties payable pursuant to Section 3.8 hereof, the City of Chicago, for each one-year period during which the City of Chicago continues to use the Licensed Software under this Agreement after the fifth anniversary of the Effective Date, shall pay to City of Inglewood Two Hundred Thousand Dollars ($200,000.00) per year, payable in advance on the fifth anniversary of the Effective Date and, as applicable, on succeeding anniversaries.

### 4.3. Marketing to Other Cities

With the prior written consent of the other party hereto, each party hereto shall have the right, for so long as the City of Chicago remains obligated to make royalty payments pursuant to Section 3.8 or Section 4.2 hereof, to market the Combined System and to grant licenses of any duration thereto, to any city, county, town, village, or other municipal or governmental unit ("Governmental Unit") in the Joint Market, on such terms and conditions as may be deemed appropriate by both of the parties hereto, subject to the provisions of this Agreement. Neither party may market or grant any license of the Combined System without the prior, express, written approval by the other party of such marketing activity and the terms and conditions of such license.

### 4.4. Division of Net Revenues

With respect to all licenses granted to other Governmental Units by either party, the parties will pool their figures on a quarterly basis for the types of revenues and expenses attributable to the Combined System that are the basis for the determination of Net Revenues, and will make a cash adjustment between themselves to accomplish the following allocations:

- 7 -

(a)     Revenues received by either party will be applied first to reimbursement of reimbursable expenses incurred by such party and next to reimbursable expenses incurred by the other party;

(b)     The first Seven Hundred Fifty Thousand Dollars ($750,000.00) of Net Revenues attributable to the Combined System will then be paid to the City of Chicago;

(c)     The next Seven Hundred Fifty Thousand Dollars ($750,000.00) of Net Revenues attributable to the Combined System will then be paid to the City of Inglewood; and

(d)     Additional Net Revenues attributable to the Combined System will be divided equally between the parties.

### 4.5.   Costs of Defense

In the event the City of Inglewood is named in a claim, suit or proceeding initiated or asserted by Electronic Data Systems, Inc., to the extent such claim, suit or proceeding is based on the use of the Licensed Software by the City of Chicago, the City of Chicago at its option will either defend Inglewood or pay Inglewood the reasonable costs to defend, including reasonable attorney fees. The City of Chicago will not, however, indemnify or reimburse the City of Inglewood for losses or damages awarded in such suit or proceeding or amounts paid to settle such claim, suit, or proceeding.

## 5.    WARRANTIES, INDEMNITIES AND LIABILITIES

### 5.1.   Warranty

(a)     Each party represents, warrants, and agrees that it has not entered and will not enter into agreements or commitments which are inconsistent with or in conflict with the rights granted to the other party in this Agreement.

(b)     City of Inglewood further represents, warrants, and agrees that:

(i)     The Licensed Software and Upgraded Software are and shall be free and clear of all liens, claims, and encumbrances, and City of Chicago, City of Chicago's customers and Transferees (as authorized hereunder) shall be entitled to use the Licensed Software, Upgraded Software, and User Documentation without disturbance.

(ii)     No portion of the Licensed Software or Upgraded Software contains, at the time of delivery, any "virus," remote-access device, timer, clock, counter, or other computer software routines or limiting designs or instructions designed to (A) permit access to or use of either the Licensed Software, the Upgraded Software, or City of Chicago's computer systems

- 8 -



by City of Inglewood or third parties not authorized by this Agreement, or (B) disable, damage, prevent operation of, or erase Licensed Software or Upgraded Software, hardware, or data, or to perform any other such actions.

(iii)    The Licensed Software, Upgraded Software, and related User Documentation (A) shall be free from material defects in design and operation, and (B) shall function properly under ordinary use and operate in conformity with applicable specifications and User Documentation. During the term of this Agreement, City of Inglewood will provide the foregoing warranties to City of Chicago at no additional charge.

(iv)    City of Inglewood shall promptly notify City of Chicago of any defects, errors or malfunctions ("Defects") in the Licensed Software, Upgraded Software, or related User Documentation of which City of Inglewood becomes aware from any source and shall promptly provide to City of Chicago modified versions which incorporate corrections of all Defects ("Corrections"). City of Inglewood shall also provide to City of Chicago all operational and support assistance necessary to cause Licensed Software and Upgraded Software to perform in accordance with their applicable specifications and User Documentation, and remedial support designed to provide a by-pass or temporary fix to a Defect until the Defect can be permanently corrected. City of Inglewood shall respond promptly to requests from City of Chicago for Licensed Software support. The warranty services specified in this Section shall be performed at no additional charges to City of Chicago, provided, however, that City of Chicago shall reimburse City of Inglewood for any incidental expenses, travel, and per diem funds as may be necessary to document, re-create and/or fix said problem on malfunction. Should analysis prove City of Chicago is not correct in asserting that the system is malfunctioning, then City of Chicago will reimburse City of Inglewood for any labor costs expended in finding same at the then-current rates plus administration costs and/or fees, said consulting rates to be the then-current rates as established by City of Inglewood's City of Council.

(v)    The Licensed Software is, and all Upgraded Software shall be, available on an IBM VSE/ESA platform utilizing CICS for transaction services, and the source code for the Licensed Software and all Upgraded Software will compile without errors using a standard IBM COBOL II compiler. Migration to another platform will be performed at the expense of City of Chicago by Chicago authorized sub-contractors.

(vi)    City of Inglewood shall promptly provide to City of Chicago any revisions to the existing User Documentation developed for

EXHIBIT _B_
PAGE 0028

the Licensed Software or the Upgraded Software or necessary to reflect all Corrections.

(c)     The City of Inglewood (or an assignee to the extent permitted by Section 6.11) shall provide reasonable assistance and cooperation to the City of Chicago and its designees as necessary and appropriate to the City of Chicago's efforts to develop the Chicago System and the Combined System.  Without limiting the generality of the foregoing, City of Inglewood shall (i) make Licensed Software training available to persons designated by City of Chicago to the extent requested by the City of Chicago, at no additional charge to City of Chicago; (ii) provide to City of Chicago, at no additional charge, such staff personnel (including any personnel agreed to in writing between City of Chicago and City of Inglewood) as may, in the judgment of the City of Chicago, be reasonably necessary in order to impart to City of Chicago or its designee all pertinent knowledge and information regarding the Licensed Software, during the period of April 1 through December 31, 1998, during normal business hours, to assist City of Chicago or its designee in understanding and documenting the Licensed Software; (iii) shall provide City of Chicago (and its third-party service-providers) with sufficient access to the Licensed Software (using a dial-up connection or otherwise) and to all other pertinent and reasonably required resources of City of Inglewood (including human resources) at all times from and after the date of this Agreement; and (iv) also provide City of Chicago with all other pertinent information requested by City of Chicago, including copies of the conversion programs used to convert City of Oakland, California to Licensed Software and of the systems information used in that conversion.

(d)     During the term of this Agreement, City of Inglewood will provide the foregoing warranties to City of Chicago at no additional charge.

(e)     The warranties provided above shall apply only to Licensed Software and Upgraded Software as supplied by City of Inglewood, but in the event modifications are made by or for the City of Chicago, the foregoing warranties shall not apply to such modifications as are made to the software by the City of Chicago or its designee that are not reviewed and approved by the City of Inglewood.

### 5.2.   Proprietary Rights Indemnification.

(a)     City of Inglewood represents and warrants that (i) no Licensed Software or Upgraded Software provided under this Agreement is the subject of any pending or threatened claim or litigation ("Litigation"), and (ii) City of Inglewood is the sole and exclusive owner of all right, title, and interest in and to the Licensed Software, Upgraded Software and related User Documentation.  City of Inglewood further represents and warrants that the Licensed Software, Upgraded Software, and related User Documentation, and their license and use hereunder, do not and shall not directly or indirectly violate or infringe upon any copyright, patent, trade secret, or other proprietary or intellectual property right of any third party, and that they further do not contribute to such violation or infringement ("Infringement").  The City of Inglewood further

- 10 -

EXHIBIT $B$
PAGE 0029

represents and warrants that no third party has asserted, is asserting or, to the City of Inglewood's knowledge, has or will have any reasonable basis to assert a claim of any Infringement.

(b)      City of Inglewood shall defend, indemnify, and hold harmless City of Chicago and their respective officers, directors and employees from and against any and all actions, claims, losses, damages, liabilities, awards costs, and expenses (including legal fees) (i) resulting from or arising out of any breach or claimed breach of the warranties contained in Sections 5.1 and 5.2; or (ii) that is based on a claim that the Licensed Software or the Upgraded Software  infringes of any patent, copyright, trade secret, or other proprietary or intellectual property right owned by any party other than the City of Inglewood acting as a municipal corporation (except to the extent such infringement is the result of modifications performed by City of Chicago or the City of Chicago's third party service providers and their respective officers, directors, employees, and agents) or that involves any dispute relating to ownership or licensing rights with respect to the Licensed Software, Upgraded Software, or related User Documentation. City of Chicago shall inform City of Inglewood of any actions, claims, or suits against City of Chicago of a type that could entitle it to such indemnity and shall have the right to participate in the defense of any such suit or proceeding at its own expense and through counsel of its choosing.  City of Inglewood shall notify City of Chicago of any actions, claims, or suits against City of Inglewood of a type that could give rise to its duty to indemnify City of Chicago.  In the event an injunction is sought or obtained against use of the Licensed Software, Upgraded Software or User Documentation, City of Inglewood shall promptly, at its option and expense, either (A) procure for City of Chicago, City of Chicago's customers and Transferees the right to continue to use the allegedly infringing Licensed Software, Upgraded Software or User Documentation as set forth in this Agreement, or (B) replace or modify the allegedly infringing Licensed Software, Upgraded Software, or User Documentation to make its use non-infringing while being capable of performing the same function without degradation of performance.

### 5.3.    Limitation of Liability

(a)      Neither party shall be liable to the other pursuant to this Agreement for any amounts representing loss of profits, loss of business or special, indirect, consequential, exemplary, or punitive damages of the other party.  The foregoing shall not limit the indemnification, defense and hold harmless obligations set forth in this Agreement.  City of Inglewood warrants, for City of Chicago's benefit alone, that the Licensed Software conforms in all material respects to all descriptions and specifications thereof furnished by City of Inglewood to City of Chicago.  This warranty is expressly conditioned on City of Chicago's observance of the operating, security, and data-control procedures set forth in the User Documentation included with the Licensed Software.

(b) . EXCEPT  AS  EXPRESSLY  SET  FORTH  IN  THIS AGREEMENT, CITY OF INGLEWOOD DISCLAIMS ANY AND ALL PROMISES, REPRESENTATIONS, AND WARRANTIES WITH RESPECT TO THE LICENSED

- 11 -

SOFTWARE, INCLUDING ITS CONDITION, ITS CONFORMITY TO ANY REPRESENTATION OR DESCRIPTION, THE EXISTENCE OF ANY LATENT OR PATENT DEFECTS, ANY NEGLIGENCE, AND ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE.

## 6.   MISCELLANEOUS

### 6.1.   Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all previous understandings or agreements relating thereto, except the Nondisclosure Agreement executed in April 1998, that are not fully expressed herein.  Except as provided herein, no change, waiver or discharge hereof shall be valid unless in writing and executed by both of the parties.

### 6.2.   Dispute Resolution

In the event of any dispute or disagreement between the parties hereto either with respect to interpretation of any provision of this Agreement or with respect to the performance by City of Inglewood or by City of Chicago hereunder, which cannot be resolved in the normal course of business, then upon written notice of either party, each of the parties will appoint a designated officer whose task it will be to meet for the purpose of endeavoring to resolve such dispute without the necessity of any formal proceeding relating thereto.  The specific format for such discussions will be left to the discretion of the designated officers.  No formal proceedings for the judicial resolution of such dispute may be commenced until (i) resolution as contemplated in this clause has not occurred within thirty (30) days after written notice of the dispute was first given by one party to the other, or (ii) either of the parties earlier concludes in good faith that amicable resolution through continued negotiation of the matter in issue does not appear likely.

### 6.3.   Notice

Notices pursuant to this Agreement shall be deemed given (i) on the date delivered, if personally delivered, or (ii) on the third day after mailing, if mailed by United States mail, first-class, postage prepaid, return receipt requested, and addressed as set forth below.  Either party may at any time change the address to which notices pursuant to this Agreement are sent.

Notices to City of Inglewood shall be addressed as follows:

City Clerk
City of Inglewood
1 Manchester Boulevard
Inglewood, CA 90301-1750

- 12 -

EXHIBIT 
PAGE 0031

With a copy to:

Jim Nyman - MIS Director
City of Inglewood
1 Manchester Boulevard
Inglewood, CA 90301-1750

Notices to City of Chicago shall be addressed as follows:

Hugh P. Murphy
Director of Revenue
City of Chicago
City Hall, Room 107
121 N. LaSalle Street
Chicago, IL 60602
Attention: Executive Director - Parking Services.

With a copy to:

Eduardo M. Cotillas, Esq.
Deputy Corporation Counsel
City of Chicago, Department of Law
City Hall, Room 610
121 North LaSalle Street
Chicago, IL 60602

### 6.4.  Headings

The section headings used herein are for reference and convenience only and shall not enter into the interpretation hereof.

### 6.5.  Relationship of Parties

Both parties, in performing their obligations hereunder, are providing service only as independent contractors, and neither party undertakes by this Agreement or otherwise to perform any obligation of the other.

### 6.6.  Force Majeure

Each party hereto shall be excused from performance hereunder (other than the performance of payment obligations) for any period and to the extent that it is prevented from performing pursuant hereto, in whole or in part, as a result of delays caused by the other party or an act of God, war, civil, disturbance, court order, labor dispute, or other cause beyond its reasonable control, including failures, fluctuations or non-availability of electrical power, heat, light, air conditioning or telecommunication

- 13 -

equipment. Such nonperformance shall not be default hereunder nor a ground for termination of this Agreement.

### 6.7. Severability

In the event that any of the terms of this Agreement is or becomes or is declared to be invalid or void by any court or tribunal of competent jurisdiction, such term or terms shall be null and void and shall be deemed severed from this Agreement and all the remaining terms of this Agreement shall remain in full force and effect.

### 6.8. No Third Party Beneficiary

Nothing in this Agreement is intended to be relied upon or to benefit any party other than the parties hereto.

### 6.9. Waiver

No delay or omission by either party hereto to exercise any right or power accruing upon any noncompliance or default by the other party with respect to any of the terms of this Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by either of the parties hereto of any of the covenants, conditions, or agreements to be performed by the other shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant, condition, or agreement herein contained.

### 6.10. Written Modifications Required

No modification of this Agreement shall be binding unless it is in writing and is signed by both of the parties.

### 6.11. Right to Transfer Rights

The City of Inglewood reserves the right to transfer all or part of its rights and/or obligations under this Agreement to an assignee or successor in interest; provided, however, that no assignment, subcontracting, or delegation by City of Inglewood of any of its duties or obligations shall release or discharge Inglewood from the direct and primary responsibility and liability therefor unless City of Chicago expressly agrees to grant such release or discharge.

### 6.12. Attorney's Fees

The Parties hereto agree that in the event of a material breach of this Agreement, the nonbreaching party shall be entitled to recoup Attorney's fees and court costs associated with the enforcement of the terms of this Agreement.

- 14 -

EXHIBIT *B*
PAGE 0033

98-286

### 6.13. Freedom of Action

(a)     Nothing in this Agreement shall be construed to (i) obligate either Party to market the Licensed Software or the Combined System, (ii) preclude or limit City of Chicago's discretion in promoting the Combined System to prospective customers or (iii) limit or restrict the City of Inglewood's title and right to license the Licensed Software.

(b)     The City of Chicago agrees not to solicit or hire employees of the City of Inglewood or its assignee in interest for any purpose without the City of Inglewood's prior written permission.

IN WITNESS HEREOF, City of Inglewood and City of Chicago have caused this Agreement to be signed by their duly authorized representatives as of the date indicated below.

**THE CITY OF CHICAGO**

Hugh P. Murphy,
Director of Revenue

Date: _7/23/58_

James Reilly,
Director of Administrative Hearings

Date: _7/24/98_

**THE CITY OF INGLEWOOD**

Mayor Roosevelt Dorn

Date: __July 21, 1998__

**ATTEST:**

Hermanita V. Harris, CMC
Inglewood City Clerk

Date: __July 21, 1998__

**APPROVED AS TO FORM:**

Jack Balas
Inglewood Acting City Attorney

Date: __July 21, 1998__

- 15 -



CITY OF INGLEWOOD CALIFORNIA
ONE MANCHESTER BOULEVARD / INGLEWOOD, CALIFORNIA 90301-1750

OFFICE OF THE MAYOR



Roosevelt F. Dorn
Mayor

August 3, 1998

Hugh Murphy, Director
City of Chicago
Department of Revenue
City Hall, Room 107
121 North LaSalle Street
Chicago, Illinois 60602

Re:   PTS License Agreement between the City of Inglewood
      and the City of Chicago

Dear Mr. Murphy:

Enclosed is your original copy of the fully executed license agreement between the City of Inglewood and the City of Chicago. We are pleased that you have selected the City of Inglewood's PTS software for the ticket processing requirements of the City of Chicago. We are confident that our software, combined with the modifications you propose, will constitute an intelligent solution for Chicago.

We understand that you are working on a short timetable to complete the installation and conversation of our software to meet your needs and we stand ready to help you do so in a timely fashion. Pursuant to our commitment to you under §5.1(c) of the Agreement, we will provide the assistance that you (or an authorized designee) will need to understand, convert and document our software.

In this connection and based on your conversation with our I.P. Attorney Bill Benman on July 15, 1998, it is my understanding that you anticipate that most of this support that you will need may be provided from Inglewood by telephone. Nonetheless, we understand that you will also need to have one or two of our employees (Messrs. L. Jimenez, G. Bower, D. Vlereck and/or J. Nyman) travel to Chicago for two to three days, as soon as possible and again in a few weeks, to provide onsite assistance of the nature described above. You indicated further that you expect that your needs for such assistance will conclude by the end of September, 1998.

Hugh Murphy, Director
City of Chicago
Department of Revenue
Page 2

Pursuant to this understanding, we are prepared to provide the requested support with the expectation that Chicago will pay for travel and lodging. We understand that the project may require additional visits other than those indicated above and, within reason, we are willing to help you in this regard. However, as I am sure you understand, we can not commit to provide the services of our staff for a substantial period of time beyond the reasonable requirements indicated by you to date.

We are optimistic that your project will be successful and we look forward to a mutually rewarding relationship. Thank you for your interest in our PTS software.

Sincerely,

Roosevelt F. Dorn
Mayor





ONE MANCHESTER BOULEVARD / P.O. BOX 6500 / INGLEWOOD, CALIF. 90301

FAX (310) 412-8865

October 18, 2001

Mr. Matthew Darst                              BY E-mail and U.S.P.S.
City of Chicago
Department of Revenue
330 N. Wabash Avenue
Chicago, IL 60611

Re:   **City of Inglewood's Parking Ticket System Software**

Dear Mr. Darst:

        I am writing to discuss the agreement for parking ticket software between the City of Inglewood and the City of Chicago (the "Agreement"). It is my understanding that the City of Chicago has recently made inquiries to the City of Inglewood regarding the possibility of marketing and licensing the enhanced software (the "Combined Software"). As you will recall, the Combined Software is derived from the proprietary software developed by the City of Inglewood's Management Information Systems Department (the "Licensed Software"). It is our understanding that the City of Chicago contracted with IBM to create the Combined Software, which may now only be used internally by Chicago.

        We have considered whether to pursue discussions with the City of Chicago regarding an agreement to market and license the Combined Software to third parties. We are inclined to have these discussions because we believe that we may be able to structure an agreement that would be beneficial to all involved. In order for us to proceed, however, we would like to better understand the relationship between the City of Chicago and IBM, and what the city of Chicago and IBM contemplate in a business arrangement between us for the Combined Software.

        To understand this relationship, we will need to review a copy of your contract(s) with IBM, and the status of the agreement(s). Note, too, that our contract with the City of Chicago provides that "....a copy of the City of Chicago's agreement with IBM will be delivered to City of Inglewood" (Preamble of the Agreement). We have not received a copy of this contract. Please send us a copy of your contract with IBM, and also provide us with the status of this contract.

F:\LEGAL\UMS\Parking Ticket Software 10.01.wpd

OFFICE OF
**CHARLES E. DICKERSON, III**
CITY ATTORNEY

TELEPHONE: 310/412-5372

Received   Nov-28-2001   04:07pm     From-12              To-CROSBY HEAFEY ROACH     Page 002

EXHIBIT  *C*
PAGE 0037

*City of Inglewood's Parking Ticket System Software*                    October 18, 2001
**Page 2**

   The City of Inglewood is also entitled to receive, upon request, a copy of the City of Chicago's system source code, object code, and user documentation. (Paragraph 2.2 of the Agreement.) Please consider this a formal request that you provide us with the Chicago System source code, object code and user documentation as required by Paragraph 2.2.

   Additionally, I am writing to call Chicago's attention to the fact that the 2001 payment of $400,000.00 for the license of the Licensed Software has not yet been received by the City of Inglewood. That payment was due to the City of Inglewood on July 21, 2001.

   Please consider this written notice of the City of Chicago's failure to make its payments as required under Section 3.8 of the Agreement. (Note that Paragraph 2.1 provides for termination of the City of Chicago's license under the Agreement if payment is not received within sixty (60) days of receipt of this written notice.)

   We should also confer to set up a meeting between the City of Chicago, IBM and the City of Inglewood to discuss how to structure an agreement regarding marketing and licensing the Combined Software to third parties.

   Thank you for your assistance in these matters. Please feel free to telephone me at the below number. We look forward to working with you.

                                        Sincerely,

                                        Charles E. Dickerson
                                        City Attorney

CED/jms

F:\LLGALUMBP\Parking Ticket Software 10.01.wpd

EXHIBIT *C*
PAGE 0038

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
1901 AVENUE OF THE STARS, SUITE 700
LOS ANGELES, CALIFORNIA 90067
(310) 734-5200
FAX (310) 734-5299
www.crosbyheafey.com

| LOS ANGELES | OAKLAND | PALO ALTO | SAN FRANCISCO | SONOMA | WESTLAKE VILLAGE |
|---|---|---|---|---|---|
| (213) 457-8000 | (510) 763-2000 | (650) 251-9880 | (415) 543-8700 | (707) 996-1776 | (805) 777-8420 |

JoAnne S. Redmann
Direct Dial: (310) 734-5277
E-mail Address: jredmann@chrm.com

December 4, 2001

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. Matthew Darst
City of Chicago
Department of Revenue
330 N. Wabash Avenue
Chicago, Illinois 60611

Mr. Hugh P. Murphy
Director of Revenue
City of Chicago
City Hall, Room 107
121 N. LaSalle Street
Chicago, Illinois 60602

Re:    City of Inglewood's Parking Ticket System Software

Dear Mr. Darst and Mr. Murphy:

Crosby, Heafey, Roach & May has been retained by the City of
Inglewood to represent it in the protection of its intellectual property. In a
letter dated October 18, 2001, Charles E. Dickerson, City Attorney for the
City of Inglewood, contacted you with respect to your agreement (the
"Agreement") with the City of Inglewood to license and further develop
parking meter technology owned by the City of Inglewood (a copy of the
letter has been enclosed for your convenience). No response to the letter
has been received by the City of Inglewood.

15283698.1

EXHIBIT $D$
PAGE 0039

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

December 4, 2001
Page 2

    In order for the City of Chicago to remain in compliance with its
rights and obligations under the Agreement it is necessary that all of the
actions set forth in Mr. Dickerson's letter be taken by the City of Chicago
immediately, including, but not limited to, delivery of a copy of the
agreement(s) between the City of Chicago and IBM; delivery of the source
code, object code and user documentation; and payment of the delinquent
Four Hundred Thousand Dollar ($400,000.00) license fee which was due
on July 21, 2001.

    The City of Chicago's continued failure to take the actions set forth
above has the potential to result in termination of the Agreement and
action on the part of the City of Inglewood to protect its intellectual
property from infringement by the City of Chicago.

    Unless the necessary items are delivered to my attention or to the
City of Chicago within fourteen (14) days of the date of this letter, the City
of Inglewood will explore all remedies legally available to it, including court
action.

                                        Sincerely

                                        JoAnne S. Redmann

JSR:jvw
Enclosures
Cc: Eduardo M. Cotillas, Esq.
      Emmerline Foote, Esq.

                                                        15283698.1

                                            EXHIBIT  D
                                            PAGE 0040

DEC-06-01 MON 02:48 PM  CITY ATTYS OFFICE  FAX NO.  P. 02



City of Chicago
Richard M. Daley, Mayor

Department of Law

Mara S. Georges
Corporation Counsel

Commercial and Policy Litigation
Suite 900
30 North LaSalle Street
Chicago, Illinois 60602-2580
(312) 744-9010
(312) 744-6798 (FAX)
(312) 744-9104 (TTY)
http://www.ci.chi.il.us

December 4, 2001

RECEIVED
DEC - 6 2001
CITY ATTORNEY

Mr. Charles E. Dickerson
City Attorney
City of Englewood, California
One Manchester Boulevard
P.O. Box 6500
Inglewood, California 90301

Re: City of Inglewood's Parking Ticket Software

Dear Mr. Dickerson:

I represent the City of Chicago and write to you at the request of Deputy Commissioner Matthew Darst of the City of Chicago Department of Revenue.

As the City of Inglewood is aware, the City of Chicago hired IBM in 1998 to assess Inglewood's parking ticket software for Y2K compliance. IBM determined that the software was not Y2K compliant and notified both the City of Chicago and the City of Inglewood of its assessment.

Section 5.1(b)(iii) of the Parking Ticket Software License Agreement Between the City of Inglewood, California and the City of Chicago, Illinois (the "Agreement") warranties that the software "shall be free from material defects in design and operation." The Y2K defect in the software is a material defect. Pursuant to section 5.1(b)(iv), the City of Inglewood "shall promptly notify City of Chicago of any defects, errors or malfunctions ("Defects") in the Licensed Software" and "shall promptly provide to the City of Chicago modified versions which incorporate corrections to all Defects." The City of Inglewood has failed correct the Y2K defect as required by section 5.1(b)(iv) of the Agreement. At the City of Chicago's request, IBM proceeded to correct the software at a cost to the City of $900,000.00.

In accordance with section 6.2 of the Agreement, the City of Chicago wishes to initiate informal resolution of Inglewood's breach of warranty and the resulting $900,000.00 damages to the City. The City appoints Deputy Commissioner Matthew Darst to represent its interests in these discussions.



NEIGHBORHOODS
BUILDING CHICAGO TOGETHER



EXHIBIT E
PAGE 0041

Charles E. Dickerson
December 4, 2001
Page 2


We look forward to an amicable resolution to these issues.

Very truly yours,

Patricia M. Moser
Assistant Corporation Counsel
Commercial & Policy Litigation Division
312/ 744-7686

EXHIBIT E
PAGE 0042



ity of Chicago
Richard M. Daley, Mayor

Department of Revenue

.a Reyna-Hickey
rector

ty Hall, Room 107
: North LaSalle Street
icago, Illinois 60602
(2) 747-4747 (IRIS)
(2) 744-0471 (FAX)
:(2) 744-2975 (TTY)

:p://www.ci.chi.il.us

December 11, 2001

Ms. JoAnne S. Redmann
Crosby, Heafey, Roach & May
1901 Avenue of the Stars, Suite 700
Los Angeles, California 90067

Re: The City of Inglewood/City of Chicago Joint System

Dear Ms. Redmann:

Thank you for your recent correspondence regarding the agreement between the City of Chicago and the City of Inglewood for the licensing and further development of a parking violation management system.

The City of Chicago is in receipt of Mr. Charles Dickerson's letter of October 18, 2001. We have been working to satisfy Mr. Dickerson's requests, including the submission of a $400,000 payment; the delivery of user documents, source code, and object code; and the provision of agreements between the City of Chicago and IBM. In regards to the former, the City of Chicago Department of Finance issued a check this afternoon. Enclosed please find a check made payable to the City of Inglewood for $400,000.

I have met with our vendor regarding the source code, object code, and user documentation. They are preparing each, and copies will be tendered shortly. In addition, I will provide the City of Inglewood with relevant portions of the City of Chicago's agreement with IBM addressing operational scope and development services.

We look forward to continuing our relationship with the City of Inglewood. Should you or officials of Inglewood have any questions or concerns, please do not hesitate to contact me at 312.742.5722.

Very truly yours,

Matt Darst

Matt Darst
Deputy Director

cc:     Patricia Moser
        Assistant Corporation Counsel

        Kirk Peterson
        Assistant Corporation Counsel

.GHBORHOODS





EXHIBIT _F_
PAGE 0043

SHEET NO. 1453923

---

# CITY OF CHICAGO
## DEPARTMENT OF FINANCE
### OFFICE OF THE COMPTROLLER
121 NORTH LASALLE STREET — ROOM 501 — CHICAGO, ILLINOIS — 60602

---

## CITY OF CHICAGO REMITTANCE ADVICE

FUND: 100   VENDOR 1061639    A

WARRANT NO.: **98282656**

| DATE | INVOICE NO. | NON-NEGOTIABLE INSTRUMENT DEPT. | VOUCHER NO. | ORDER NO. | AMOUNT |
|------|-------------|-------------|-------------|-----------|--------|
| 121001 | 070101 | REVENU | PV29 012901850 | PD29 012901850 | ********200,000.00 |
| 121001 | 070101 | ADMIN | PV29 012901850 | PD29 012901850 | ********200,000.00 |

TOTAL: $********400,000.00

---

THIS DOCUMENT HAS BLACK PRINTING OVER A LIGHT GREEN BACKGROUND ON WHITE PAPER

DATE: 12 11 01

## TO THE TREASURER OF THE CITY OF CHICAGO

SERIAL NUMBER **98282656**

98282656

| FUND | DEPT. | ORGN. | OBJT. |
|------|-------|-------|-------|
| 100 | 29 | 4654 | 0140 |
| 100 | 30 | 2005 | 0140 |

VENDOR 1061639    A
TO THE ORDER OF:

2-439 / 710

$400,000.00

CITY OF INGLEWOOD, CALIFORNIA
ONE MANCHESTER BLVD, 1ST FL
INGLEWOOD, CA
                    903011750



REVERSE SIDE HAS CITY SEAL WATERMARK.

MAYOR

CITY COMPTROLLER

EXHIBIT F
PAGE 0044

# CROSBY, HEAFEY, ROACH & MAY

PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

1901 AVENUE OF THE STARS, SUITE 700

LOS ANGELES, CALIFORNIA 90067

(310) 734-5200

FAX (310) 734-5299

www.crosbyheafey.com

| LOS ANGELES | OAKLAND | SAN FRANCISCO | SANTA ROSA | SONOMA |
|---|---|---|---|---|
| (213) 896-8000 | (510) 763-2000 | (415) 543-8700 | (707) 524-3705 | (707) 996-1776 |

JoAnne S. Redmann
Direct Dial: (310) 734-5277
E-mail Address: jredmann@chrm.com

December 19, 2001

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. Matthew Darst
Deputy Commissioner
City of Chicago
Department of Revenue
330 N. Wabash Avenue
Chicago, Illinois 60611

Re:     City of Inglewood's Parking Ticket System Software

Dear Mr. Darst:

We are in receipt of your letter dated December 11, 2001 and the Four Hundred Thousand-Dollar ($400,000.00) license fee payable to the City of Inglewood. We are pleased that the City of Chicago is attempting to comply with its obligations under the Parking Ticket Software License Agreement between the City of Inglewood and the City of Chicago dated July 21, 1998 (the "Agreement").

Please note that the preamble to the Agreement provides that the City of Inglewood will be provided a copy of the agreement between the City of Chicago and IBM -- not just the portions deemed relevant by the City of Chicago. Please provide a complete copy of the agreement between the City of Chicago and IBM at your earliest convenience.

15286095.1

EXHIBIT G
PAGE 0045

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

Mr. Matthew Darst
December 19, 2001
Page 2


        After receipt of the requested documents, the City of Inglewood is
willing to meet with the City of Chicago to discuss commercialization of
the parties' respective proprietary technology pursuant to Section 4.3 of
the Agreement.  Please advise me as to your availability to do so.  I look
forward to hearing from you shortly.


                                        Sincerely,

                                        JoAnne S. Redmann


JSR:jvw:act

cc: Emmerline Foote, Esq.



15286095.1

MAR-12-02 TUE 03:00 PM CITY ATTYS OFFICE     FAX NO.          P. 02



**City of Chicago**
Richard M. Daley, Mayor

**Department of Revenue**

Bea Reyna-Hickey
Director

City Hall, Room 107
121 North LaSalle Street
Chicago, Illinois 60602
(312) 747-4747 (IRIS)
(312) 744-0471 (FAX)
(312) 744-2975 (TTY)
http://www.ci.chi.il.us

March 1, 2002

Mr. Charles E. Dickerson
City Attorney
City of Inglewood, California
One Manchester Boulevard
P.O. Box 6500
Inglewood, CA 90301

RE: Parking Ticket Software License Agreement between the City of
     Inglewood and City of Chicago

Dear Mr. Dickerson:

I write you in regards to Assistant Corporation Counsel Patricia M.
Moser's correspondence to you dated December 4, 2001. A copy of
that letter is attached for your convenience. To date the City of
Chicago has received no response to that letter.

The City of Chicago is seeking to initiate the informal dispute
resolution provision of the Parking Ticket Software License
Agreement (the "Agreement"). The invocation of this provision stems
from the City of Inglewood's breach of warranties, including sections
5.1(b)(iii) and (iv) of the Agreement. I refer you to Ms. Moser's letter
of December 4, 2001, documenting the extent of the breach.

I would like to discuss resolution of this dispute as soon as possible
with you or a designated representative. Please feel free to contact
me towards this end at 312.742.5722. I look forward to working with
the City of Inglewood to achieve amicable resolution.

Very truly yours,

Matt Darst

Matt Darst
Deputy Director
Attorney at Law

CC:   Assistant Corporation Counsel Patricia Moser
      Assistant Corporation Counsel Kirk Peterson







EXHIBIT H
PAGE 0047

DEC 0 5 2001



City of Chicago
Richard M. Daley, Mayor

Department of Law

Mara S. Georges
Corporation Counsel

Commercial and Policy Litigation
Suite 600
30 North LaSalle Street
Chicago, Illinois 60602-2580
(312) 744-9010
(312) 744-6798 (FAX)
(312) 744-9104 (TTY)
http://www.ci.chi.il.us

December 4, 2001

Mr. Charles E. Dickerson
City Attorney
City of Englewood, California
One Manchester Boulevard
P.O. Box 6500
Inglewood, California 90301

Re: City of Inglewood's Parking Ticket Software

Dear Mr. Dickerson:

I represent the City of Chicago and write to you at the request of Deputy Commissioner Matthew Darst of the City of Chicago Department of Revenue.

As the City of Inglewood is aware, the City of Chicago hired IBM in 1998 to assess Inglewood's parking ticket software for Y2K compliance. IBM determined that the software was not Y2K compliant and notified both the City of Chicago and the City of Inglewood of its assessment.

Section 5.1(b)(iii) of the Parking Ticket Software License Agreement Between the City of Inglewood, California and the City of Chicago, Illinois (the "Agreement") warranties that the software "shall be free from material defects in design and operation." The Y2K defect in the software is a material defect. Pursuant to section 5.1(b)(iv), the City of Inglewood "shall promptly notify City of Chicago of any defects, errors or malfunctions ("Defects") in the Licensed Software" and "shall promptly provide to the City of Chicago modified versions which incorporate corrections to all Defects." The City of Inglewood has failed correct the Y2K defect as required by section 5.1(b)(iv) of the Agreement. At the City of Chicago's request, IBM proceeded to correct the software at a cost to the City of $900,000.00.

In accordance with section 6.2 of the Agreement, the City of Chicago wishes to initiate informal resolution of Inglewood's breach of warranty and the resulting $900,000.00 damages to the City. The City appoints Deputy Commissioner Matthew Darst to represent its interests in these discussions.





EXHIBIT H
PAGE 0048

Charles E. Dickerson
December 4, 2001
Page 2


We look forward to an amicable resolution to these issues.

Very truly yours,

Patricia M. Moser
Assistant Corporation Counsel
Commercial & Policy Litigation Division
312/ 744-7686


BCC:  Matthew Darst
      Kirk Peterson

EXHIBIT  H
PAGE 0049

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
1901 AVENUE OF THE STARS, SUITE 700
LOS ANGELES, CALIFORNIA 90067
(310) 734-5200
FAX (310) 734-5299
www.crosbyheafey.com

| LOS ANGELES | OAKLAND | PALO ALTO | SAN FRANCISCO | SONOMA | WESTLAKE VILLAGE |
|---|---|---|---|---|---|
| (213) 457-8000 | (510) 763-2000 | (650) 251-9880 | (415) 543-8700 | (707) 996-1776 | (805) 777-8420 |

JoAnne S. Redmann
Direct Dial: (310) 734-5277
E-mail Address: jredmann@chrm.com

March 26, 2002

**BY CERTIFIED MAIL**
 **RETURN RECEIPT REQUESTED**

Mr. Matthew Darst
Deputy Commissioner
City of Chicago
Department of Revenue
330 N. Wabash Avenue
Chicago, Illinois 60611

Re:   City of Inglewood's Parking Ticket System Software

Dear Mr. Darst:

   I am in receipt of your letter of March 1, 2002 regarding informal dispute resolution of the City of Chicago's claim of breach of warranty of the Parking Ticket Software License Agreement ("Agreement") between the City of Inglewood and the City of Chicago. In your letter, you reference Assistant Corporation Counsel Patricia M. Moser's correspondence dated December 4, 2001 (the "Moser Correspondence").

   The City of Inglewood did not respond to the Moser Correspondence for the following reasons:

   1.     Only days after receiving the Moser Correspondence, the City of Inglewood received your letter of December 11, 2001 and the overdue $400,000 license fee payment. Because of the City of Chicago's tender of the $400,000, the City of Inglewood management assumed that the Moser Correspondence was in error; and

15300743.1

EXHIBIT *I*
PAGE 0050

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

Mr. Matthew Darst
March 26, 2002
Page 2

2.       There is no Y2K defect in the City of Inglewood parking ticket
software and there never was. As the first notice of any such claim of a
Y2K defect was almost two (2) years after January 1, 2000, it was
assumed that this claim was either in error or made in bad faith. When we
received your subsequent correspondence of December 11, 2001 and
payment, it was assumed that the former was correct.

Beginning with Mr. Charles Dickerson's letter of October 18, 2001,
the City of Inglewood has now made four (4) formal written requests for a
copy of agreement(s) between the City of Chicago and IBM that relate to
the City of Chicago's parking ticket system. In fact, in your
correspondence of December 11, 2001, you agreed to provide "relevant
portions of the City of Chicago's agreement with IBM addressing
operational scope and development services." I responded in pertinent part
with:

Please note that the preamble to the Agreement provides that
the City of Inglewood will be provided a copy of the agreement
between the City of Chicago and IBM -- not just the portions
deemed relevant by the City of Chicago. Please provide a complete
copy of the agreement between the City of Chicago and IBM at your
earliest convenience.

It is now almost three months later and you still have not provided
any documentation related to the agreement(s) between the City of
Chicago and IBM. Please IMMEDIATELY provide the agreement(s).

Based on previous inaction, I am inclined to believe that
Paragraph 6.2(ii) of the Agreement should be applied here, i.e., "if either of
the parties concludes in good faith that continued negotiation of the matter
in issue does not appear likely," that informal dispute resolution is not
necessary. I am not convinced that such negotiation would be productive.
However, the City of Inglewood is still interested in making a last attempt
at offering to confer regarding the possibility of some type of joint effort to
commercialize its parking meter software and the City of Chicago's
derivative parking meter software.

In response to your request for the appointment of representatives to
discuss outstanding issues (note that we do consider the City of Chicago's

15300743.1

EXHIBIT _I_
PAGE 0051

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

Mr. Matthew Darst
March 26, 2002
Page 3

claim for breach of warranty frivolous), the City of Inglewood appoints
Emmerline Foote, Esq. and myself as co-representatives for the purpose of
conferring regarding dispute resolution. We invite you to either visit us in
person or set up a conference call at your earliest convenience.

Sincerely,

JoAnne S. Redmann

JSR:act
cc: Emmerline Foote, Esq.

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only: No Insurance Coverage Provided)

City of Inglewood

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Recipient's Name (Please Print Clearly) (To be completed by mailer)
Dept. of Revenue, Dep. Cusin City Chicag
Street, Apt. No.; or PO Box No.
330 N. Wabash Avenue
City, State, ZIP+4
Chicago, IL 60611
PS Form 3800, February 2000          See Reverse for Instructions

15300743.1

EXHIBIT I
PAGE 0052





City of Chicago
Richard M. Daley, Mayor

Department of Revenue

Bea Reyna-Hickey
Director

City Hall, Room 107
121 North LaSalle Street
Chicago, Illinois 60602
(312) 747-4747 (IRIS)
(312) 744-0471 (FAX)
(312) 744-2975 (TTY)

http://www.ci.chi.il.us

May 21, 2002

Ms. JoAnne S. Redmann
Crosby, Heafey, Roach & May
Attorneys at Law
1901 Avenue of the Stars, Suite 700
Los Angeles, CA 90067

RE:   Parking Ticket Software License Agreement between the
      City of Inglewood and the City of Chicago

Dear Ms. Redmann:

Thank you for your response to my letter of March 1, 2002, to Charles E. Dickerson concerning the City of Chicago's desire to initiate informal dispute resolution as provided for under the Parking Ticket Software License Agreement (the "Inglewood Agreement"). The invocation of this provision stemmed from breaches of warranties, including sections 5.1(b)(iii) and (iv).

The formal claim of year 2000 defects was not made in error and was certainly not made in bad faith as your letter of March 26, 2002, suggests. Neither does it constitute the first time the breaches of warranties have been raised. I have personally spoken to programmers and officials with the City of Inglewood to express these concerns in the past, and initially asked IBM to review cleanup activities associated with Year 2000 in July of 2000. That request of IBM was made in preparation of our visit to the City of Inglewood in September 2000 to discuss marketing and liability issues. Our expenditures to correct year 2000 deficiencies are not imaginary, and we have in good faith shared all enhancements related to year 2000 with officials of the City of Inglewood.

My delay in sharing a copy of Parking and Administrative Hearings Management, System Development, Operation, and Related Services agreement between the City of Chicago and IBM (the "IBM Agreement") with the City of Inglewood is prefaced on two notions. First, while the preamble of the Inglewood Agreement notes that a copy of the IBM Agreement will be delivered to the City of Inglewood, nowhere is the preamble incorporated in the Inglewood Agreement. Consequently, the City of Chicago is under no obligation to share the IBM Agreement with Inglewood.

Second, and more importantly, the City of Inglewood has acted in bad faith to market the Combined System with the City of Chicago. The City of Chicago has shown a desire to cooperatively market the Combined System

NEIGHBORHOODS.





EXHIBIT ___√___
PAGE 0053

for years and has received no assurances from the City of Inglewood in this regard. After efforts by the City of Chicago to pursue marketing options— including a host of memoranda and visits to the City of Inglewood—went ignored, the City of Chicago determined that the Inglewood wanted to market PTS solely. Other than during negotiations of the Inglewood Agreement, officials of the City of Inglewood have never indicated a desire to market the Combined System. Consequently, statements beginning in October 2001 that the City of Inglewood is now inclined to have further discussions in this regard ring hollow at this late date.

Both IBM and the City of Chicago worked painstakingly to define equipment needs, business processes, and other terms and conditions. There are a number of unique and novel concepts documented in the IBM Agreement, and the City of Chicago considers these notions intellectual property. Further, the IBM Agreement is labeled as confidential. The City of Chicago has little incentive to share the IBM Agreement with the City of Inglewood. Inglewood has clearly shown a will to aggressively market PTS— currently incorporating a number of the Combined System's enhancements—to the City of Chicago's exclusion.

The City of Chicago is prepared, however, to provide the City of Inglewood with a copy of the IBM Agreement as long as certain restrictions on the release of the document are realized. Enclosed please find a nondisclosure agreement to be completed and returned by officials of the City of Inglewood. Upon signature and receipt, I will gladly provide one copy of the IBM Agreement.

I again invoke the dispute resolution provision of section 6.2 in hopes that there can be an attempt to achieve amicable resolution. I believe that your conclusion that "amicable resolution through continued negotiation of the matter in issue does not appear likely" may be premature based upon the facts set forth above. Please contact me at 312.742.5722 to discuss this or any other issue in further detail.

Very truly yours,

Matthew Darst
Deputy Director
Attorney at Law


CC:     Assistant Corporation Counsel Patricia Moser
        Assistant Corporation Counsel Kirk Peterson

## NONDISCLOSURE AGREEMENT

This nondisclosure agreement ("Agreement") is entered into as of _____ ("Effective Date") by and between the City of Chicago, Illinois ("Chicago") and the City of Inglewood, California ("Inglewood"). In order to induce Chicago to disclose its confidential information, Inglewood agrees to accept such information under the restrictions set forth in this Agreement.

### 1. Definition of Confidential Information

"Confidential Information" means valuable information not generally known to the public relating to the Parking and Administrative Hearings Management, System Development, Operation, and Related Services Agreement with IBM Corporation, which is being disclosed to Inglewood in written form and marked "Confidential." Confidential Information may include, but need not be limited to, trade secrets, know-how, inventions, techniques, processes, algorithms, software programs, schematics, software source documents, contracts, customer lists, financial information, sales and marketing plans and information and business plans.

### 2. Confidentiality

Inglewood agrees to maintain in confidence Confidential Information and not to disclose such information to any person except its Chief Information Officer. Inglewood must take reasonable measures to maintain the confidentiality of the Confidential Information, but not less than the measures it uses for its own confidential information of a similar type.

These obligations do not apply to the extent that Confidential Information includes information which:

(a)     is already known to Inglewood at the time of disclosure, which knowledge Inglewood will have the burden of proving:

(b)     is received by Inglewood from a third party without restriction on disclosure;

(c)     is independently developed by Inglewood without reference to Confidential Information, which independent development Inglewood will have the burden of proving;

(d)     is approved for release by written authorization of Chicago; or

(e)     is required to be disclosed by a government agency further the objectives of this Agreement or by a proper order of a court of competent jurisdiction; provided, however, the Inglewood will minimize such disclosure and will consult with and assist Chicago in obtaining a protective order prior to such disclosure.

EXHIBIT ✓
PAGE 0055

### 3. Materials

All material including, without limitation, documents, drawings, models, apparatus, sketches, designs and lists furnished to Inglewood by Chicago which contain Confidential Information will remain the property of Chicago. Inglewood will not create photocopies or other reproductions of the material, and will return to Chicago or destroy such materials and all copies of them upon termination of the Agreement or upon written request of Chicago.

### 4. Termination

This Agreement will terminate thirty (30) days after the Effective Date unless terminated earlier by either party. Chicago may extend the term of the Agreement by written notice to Inglewood. Either party may terminate this Agreement, with or without cause, by giving notice of termination to the other party. The Agreement will terminate immediately upon receipt of such notice. Upon termination of this Agreement, Inglewood must cease to use Confidential Information and must comply with Article 3 within twenty (20) days of the date of termination.

Not withstanding the termination of this Agreement, Inglewood's obligations in Article 2 will survive such termination for a period of five (5) years.

### 5. Injunctive Relief

Inglewood acknowledges and agrees that Chicago will suffer irreparable injury not compensable by money damages and therefore will not have an adequate remedy at law in the event of unauthorized use or disclosure of the Confidential Information in breach of provisions of this Agreement. Accordingly, Chicago will be entitled to injunctive relief to prevent or curtail any such breach, threatened or actual. The foregoing will be in addition and without prejudice to such rights that Chicago may have at law or in equity.

### 6. General Provisions

### 6.1 Choice of Law

This Agreement will be governed by and construed in accordance with the laws of the United States and the State of Illinois as applied to transactions entered into and to be performed wholly within Illinois between Illinois residents.

### 6.2 Notice

Any notice provide for or permitted under this Agreement will be treated as having been given when (a) delivered personally, (b) sent by confirmed telecopy, (c) sent by commercial overnight courier with written verification or receipt, or (d) mailed postage prepaid by certified of registered mail, return receipt requested, to the party to be notified, at the address set forth below, or at such other place of which the other party has been notified in accordance with the provisions of this Section. Such notice will be treated as having been received upon earlier of actual receipt or five (5) days after posting.

### 6.3 Assignment

Neither party may assign its rights under this Agreement. Except as provided in Section 2, this Agreement may be amended or supplemented only by a writing that is signed and duly authorized by representatives of both parties. No term or provision in this Agreement will be considered waived by either party, and not breach excused by either party, unless such waiver or consent is in writing signed on behalf of the party against whom the waiver is asserted. No consent by either party to, or waiver of, a breach by either party, whether express or implied, will constitute consent to, waiver of, or excuse of any other, different, or subsequent breach by either party.

### 6.4 Severability

If any part of this Agreement is found unenforceable or invalid, that part will be amended to achieve as nearly as possible the same economic effect as the original provision and the remainder of this Agreement will remain in full force.

### 6.5 Entire Agreement

This Agreement constitutes the entire agreement between the parties relating to this subject matter and supercedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether written or oral.

**City of Chicago**

By: _____

Title: _____

Address: _____

_____

**City of Inglewood**

By: _____

Title: _____

Address: _____

_____

EXHIBIT __✓__
PAGE 0057

CROSBY, HEAFEY, ROACH & MAY

PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

1901 AVENUE OF THE STARS, SUITE 700

LOS ANGELES, CALIFORNIA 90067

(310) 734-5200

FAX (310) 734-5299

www.crosbyheafey.com

| LOS ANGELES | OAKLAND | PALO ALTO | SAN FRANCISCO | WESTLAKE VILLAGE |
|---|---|---|---|---|
| (213) 457-8000 | (510) 763-2000 | (650) 251-9880 | (415) 543-8700 | (805) 777-8420 |

JoAnne S. Redmann
Direct Dial: (310) 734-5277
E-mail Address: jredmann@chrm.com

August 21, 2002

**U.S. MAIL, FIRST CLASS, POSTAGE PREPAID**
**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Mr. Matthew Darst
City of Chicago
Department of Revenue
330 N. Wabash Avenue
Chicago, Illinois 60611

Mr. Hugh P. Murphy
Director of Revenue
City of Chicago
City Hall, Room 107
121 N. LaSalle Street
Chicago, Illinois 60602

Re:    Parking Ticket Software License Agreement
       between the City of Inglewood, California and
       the City of Chicago, Illinois (the "Agreement")

Dear Mr. Darst and Mr. Murphy:

       Section 3.8 of the Agreement, Royalty Payments for Usage by
Chicago, requires that the City of Chicago make a royalty payment in the
amount of $400,000.00 on or before July 24, 2002 (the anniversary of the
Effective Date). To date, this payment has not been made to the City of
Inglewood and is now overdue. That is, the City of Chicago has willfully

15283698.1

EXHIBIT _K_
PAGE 0058

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

Mr. Matthew Darst
Mr. Hugh P. Murphy
August 21, 2002
Page 2

and wrongfully failed to make its royalty payment for July 24, 2002 as required under Section 3.8 of the Agreement.

This letter is written notice pursuant to Section 2.1(ii) of the Agreement that the City of Inglewood intends to revoke the City of Chicago's license to the Licensed Software if the City of Chicago fails to make its $400,00.00 royalty payment within sixty (60) days of the receipt of this notice.

Sincerely,

*JoAnne S. Redmann*

JoAnne S. Redmann

JSR:act
cc:    Eduardo M. Cotillas, Esq.
       Emmerline Foote, Esq.
       *Clerk, James Laski*

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7001 2510 0004 8373 7242

| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To Mr. Hugh P. Murphy
City of Chicago, Dir. of Revenue
Street, Apt. No. 121 N. LaSalle Street, Room 107
or PO Box No.
City, State, ZIP+4 Chicago, IL  60602

PS Form 3800, January 2001          See Reverse for Instructions

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7001 2510 0004 8373 7299

| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To Mr. Matthew Darst
City of Chicago, Dept. of Revenue
Street, Apt. No. 330 N. Wabash Avenue
or PO Box No.
City, State, ZIP+4 Chicago, IL  60611

PS Form 3800, January 2001          See Reverse for Instructions

7001 2510 0004 8373 0

| Total Postage & Fees | $ | |

Sent To Eduardo M. Cotillas, Esq.
Deputy Corporation Counsel
Street, Apt. No. 121 N. LaSalle Street, Room 107
or PO Box No.
City, State, ZIP+4 Chicago, IL  60602

PS Form 3800, January 2001          See Reverse for Instructions

7001 0320 0

| Total Postage & Fees | $ | |

Sent To Mr. James J. Laski
City Clerk of Chicago
Street, Apt. No. 121 N. LaSalle Street, Room 107
or PO Box No.
City, State, ZIP+4 Chicago, IL  60602

PS Form 3800, January 2001          See Reverse for Instructions

15283698.1

EXHIBIT K
PAGE 0059

**SENDER:**
- Complete items 1 and/or 2 for additional services.
  Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *"Return Receipt Requested"* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

3. Article Addressed to:

7001 2510 0004 8373 7299

Mr. Matthew Darst
City of Chicago, Dept. of Revenue
330 N. Wabash Avenue
Chicago, IL 60611

4b. Service Type
- ☐ Registered          ☒ Certified
- ☐ Express Mail        ☐ Insured
- ☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

5. Received By: *(Print Name)*
Y. BRANTLEY

6. Signature *(Addressee or Agent)*

8. Addressee's Address *(Only if requested and fee is paid)*

PS Form 3811, December 1994          102595-99-B-0223          Domestic Return Receipt

*Is your RETURN ADDRESS completed on the reverse side?*

*Thank you for using Return Receipt Service.*

**SENDER:**
- Complete items 1 and/or 2 for additional services.
  Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

3. Article Addressed to:

Eduardo M. Cotillas, Esq.
Deputy Corporation Counsel
121 N. LaSalle Street, Room 107
Chicago, IL 60602

4a. Article No.
7001 2510 0004 8373 7275

4b. Service Type
☐ Registered        ☑ Certified
☐ Express Mail      ☐ Insured
☐ Return Receipt for Merchandise   ☐ COD

7. Date of Delivery

5. Received By: *(Print Name)*

8. Addressee's Address *(Only if requested and fee is paid)*

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

RECEIVED
SEP 4 - 2002

EXHIBIT K
PAGE 0061



**City of Chicago**
Richard M. Daley, Mayor

**Department of Law**

Mara S. Georges
Corporation Counsel

Commercial and Policy Litigation
Suite 900
30 North LaSalle Street
Chicago, Illinois 60602-2580
(312) 744-9010
(312) 744-6798 (FAX)
(312) 744-9104 (TTY)
http://www.ci.chi.il.us

October 22, 2002

<u>By Overnight Delivery</u>
Ms. JoAnne S. Redmann
Crosby, Heafey, Roach & May
1901 Avenue of the Stars
Suite 700
Los Angeles, California
90067

Re:    <u>Royalty Payment - PTS License Agreement</u>

Dear JoAnne:

      Enclosed please find the City of Chicago's warrant Number 98479797, in the amount of $100,000.00, payable to the City of Inglewood for royalties currently due under the PTS license agreement between the City of Inglewood and the City of Chicago.

      As you know, the City of Chicago plans to switch over its parking ticket collection operation from the Combined System to the new Oracle-based system on January 1, 2003. As you may also know, the City of Chicago is currently experiencing a well publicized and significant budget shortfall. To address the shortfall, the City has laid off 425 employees, required unpaid furlough days for remaining employees, frozen 1,000 vacant positions, and plans to lay off an additional 200 employees during the next several months. Given the fact that the City intends to use the use the Combined System for approximately two more months, and given the City's severe budget shortfall, the City intends to pay Inglewood future royalties on a *pro rata* basis of $33,333.33 per month. The enclosed warrant covers *pro rata* payments for the months of August, September and October 2002.

      As you know from my letter to you dated October 8, 2002, the City of Chicago has provided Inglewood with a revised demand of $378,125.00 for costs incurred to address the Y2K defects in the PTS. The non-prorated royalty payment of $400,000.00, offset by the City demand, equals a net royalty payment of $21,875.





EXHIBIT  <u>L</u>
PAGE 0062

Ms. JoAnne S. Redmann
October 22, 2002
Page 2

Because the enclosed warrant greatly exceeds the net royalty amount currently due, we believe it more than satisfies the City's current obligations under the license agreement.

Very truly yours,

Patricia M. Moser
Senior Counsel
Commercial & Policy Litigation
312/ 744-7686

Enclosure

EXHIBIT L
PAGE 0063

## CROSBY, HEAFEY, ROACH & MAY

PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

1901 AVENUE OF THE STARS, SUITE 700

LOS ANGELES, CALIFORNIA 90067

(310) 734-5200

FAX (310) 734-5299

www.crosbyheafey.com

| LOS ANGELES | OAKLAND | PALO ALTO | SAN FRANCISCO | WESTLAKE VILLAGE |
|---|---|---|---|---|
| (213) 457-8000 | (510) 763-2000 | (650) 251-9880 | (415) 543-8700 | (805) 777-8420 |

JoAnne S. Redmann
Direct Dial: (310) 734-5277
E-mail Address: jredmann@chrm.com

October 27, 2002

**HAND DELIVERED**

## NOTICE OF IMMEDIATE REVOCATION OF LICENSE AND DEMAND THAT THE CITY OF CHICAGO IMMEDIATELY CEASE ALL USE OF THE LICENSE SOFTWARE

Mr. Matthew Darst
City of Chicago
Department of Revenue
330 N. Wabash Avenue
Chicago, Illinois 60611

Mr. Hugh P. Murphy
Director of Revenue
City of Chicago
City Hall, Room 107
121 N. LaSalle Street
Chicago, Illinois 60602

Re:    Parking Ticket Software License Agreement
between the City of Inglewood, California and
the City of Chicago, Illinois (the "Agreement")

Dear Mr. Darst and Mr. Murphy:

Section 3.8 of the Agreement, Royalty Payments for Usage by Chicago, requires that the City of Chicago make a royalty payment for the license

15338323.1

EXHIBIT _M_
PAGE 0064

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

Mr. Matthew Darst
Mr. Hugh P. Murphy
October 27, 2002
Page 2

to the Licensed Software (the "License") in the amount of $400,000.00 on or before July 24, 2002 (the anniversary of the Effective Date). To date, this payment has not been made to the City of Inglewood. Written notice that this payment had not been made and was overdue was provided to the City of Chicago on or before August 24, 2002, more than sixty (60) days ago. In the written notice, the City of Inglewood gave notice to the City of Chicago that the City of Inglewood would revoke the City of Chicago's License to the License Software if the outstanding amount of $400,000.00 was not paid on or before sixty (60) days from the August 21, 2002 date of notice. To date, the City of Chicago has not paid the July 24, 2002 royalty payment of $400,000.00 and that amount remains outstanding. The City of Chicago's October 23, 2002 offer of a reduced payment in the amount of $100,000.00 was not accepted by the City of Inglewood. The City of Chicago has willfully and wrongfully failed to make its royalty payment for July 24, 2002 as required under Section 3.8 of the Agreement.

This letter is written notice pursuant to Section 2.1(ii) of the Agreement that the City of Inglewood **hereby revokes** the City of Chicago's License to the Licensed Software. **THE CITY OF CHICAGO IS NO LONGER LICENSED TO USE THE LICENSED SOFTWARE.** The City of Chicago must immediately cease all use of the License Software and the Combined System to the extent that the Combined System includes any of the Licensed Software. The City of Inglewood demands return of all of its Licensed Software.

Any further use of the Licensed Software beyond the receipt of this notice of revocation will be constructed by the City of Inglewood to be willful and deliberate copyright infringement of the Licensed Software, for which the City of Inglewood will take further action as necessary to protect its valuable rights in its copyrighted Licensed Software.

Please provide me with immediate confirmation before noon on Monday, October 28, 2002 that the City of Chicago has ceased all use of the Licensed Software, including the Combined Software, which contains the Licensed Software.

15338323.1

EXHIBIT M
PAGE 0065

CROSBY, HEAFEY, ROACH & MAY
PROFESSIONAL CORPORATION

Mr. Matthew Darst
Mr. Hugh P. Murphy
October 27, 2002
Page 3

If you have any questions, I can be reached at the telephone number noted above.

Sincerely,

JoAnne S. Redmann

JSR:act
cc: Emmerline Foote, Esq.

15338323.1

EXHIBIT M
PAGE 0066